UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| LEWIS PITTS, | : | Hon. Joseph H. Rodriguez |
| Plaintiff, | : | Civil Action No. 13-2350 |
| LEONE INDUSTRIES, et al., | : | OPINION |
| Defendants. | : | |

This matter is before the Court on cross-motions for summary judgment filed by Defendant ARAMARK Uniform & Career Apparel, LLC (f/k/a ARAMARK Uniform Services, Inc. and ARAMARK Uniform & Career Apparel, Inc.) [62] and Plaintiff Lewis Pitts [66]. The Court heard oral argument on the motions on February 19, 2015 and the record of that proceeding is incorporated here. For the reasons placed on the record that day, and those set forth below, ARAMARK's motion for summary judgment will be granted and Plaintiff's motion for partial summary judgment will be denied.

## Background

This case involves claims arising from a workplace accident which occurred on February 8, 2012 when Plaintiff Lewis Pitts was operating a bottle manufacturing machine during the course of his employment at Leone Industries, Inc. As against moving Defendant ARAMARK, Plaintiff has asserted claims of negligence (Count VIII) and violation of the New Jersey Products Liability Act ("NJPLA"), N.J. Stat. Ann. § 2A:58C-2 (Count VII), relating to ARAMARK's rental of uniform shirts to Leone Industries for use by its employees. Plaintiff has alleged that while he was working, his shirt came into contact with hot bottles on a conveyor, ignited, and burst into flames, causing him serious injury. (Fourth Am. Compl., ¶61.) He contends that the uniform

1

shirt was a defective product negligently sold and/or distributed for use near or over machines and bottles which emitted extremely high temperatures.[1]  (Id., ¶64, 69.)

ARAMARK has moved for summary judgment on both claims against it, arguing that it had no duty to require Plaintiff's employer to rent only fire resistant apparel for its employees who worked in the area of the factory subject to high temperatures. Plaintiff's cross-motion argues that because ARAMARK knew that Leone employees were using untreated 100% cotton shirts in the "hot end" of the factory, ARAMARK's product should be deemed defective as a matter of law due to Leone's foreseeable misuse.

## Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) generally provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact" such that the movant is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Such a showing must be supported by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).

A "genuine" dispute of "material" fact exists where a reasonable jury's review of the evidence could result in "a verdict for the non-moving party" or where such fact might otherwise affect the disposition of the litigation.  Anderson v. Liberty Lobby, Inc.,

---

[1] Although the Fourth Amended Complaint references ARAMARK providing cleaning services for the uniforms used by Leone's employees, discovery revealed that Plaintiff laundered his own shirts, (Pl. Dep. 127:17-18; 357:7-21; 358:11-24), and Plaintiff's counsel has indicated that ARAMARK's claim that it did not negligently clean the shirt which caught fire is not contested.  See Pl. Counsel's Letter dated Sept. 10, 2014.

477 U.S. 242, 248 (1986).  Disputes over irrelevant or unnecessary facts, however, will fail to preclude the entry of summary judgment.  Id.

In evaluating a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, and must provide that party the benefit of all reasonable inferences.  Scott v. Harris, 550 U.S. 372, 378 (2007); Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014).  Any such inferences "must flow directly from admissible evidence[,]" because "'an inference based upon [ ] speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment.'"  Halsey, 750 F.3d at 287 (quoting Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990) (citing Anderson, 477 U.S. at 255)).

Accordingly, the moving party initially has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the non-moving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Again, to withstand a properly supported motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Andersen, 477 U.S. at 256-57.  "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)).  Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

3

Celotex, 477 U.S. at 322.  The movant can support the assertion that a fact cannot be genuinely disputed by showing that "an adverse party cannot produce admissible evidence to support the [alleged dispute of] fact."  Fed. R. Civ. P. 56(c)(1)(B); accord Fed. R. Civ. P. 56(c)(2).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  Credibility determinations are the province of the factfinder.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).  Finally, "[t]he standard by which the court decides a summary judgment motion does not change when the parties file cross-motions."  United States v. Kramer, 644 F. Supp. 2d 479, 488 (D.N.J. 2008).  Consequently, the court's evaluation of the pending motions remains unaltered: "the court must consider the motions independently and view the evidence on each motion in the light most favorable to the party opposing the motion."  Id. (citation omitted).

The New Jersey Products Liability Act

> A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it: a. deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or b. failed to contain adequate warnings or instructions, or c. was designed in a defective manner.

N.J.S.A. § 2A:58C–2.  Three causes of action are established under the Act: claims for design defect, manufacturing defect, or warnings defect.  Roberts v. Rich Foods, Inc., 654 A.2d 1365, 1380 (N.J. 1995).

4

A successful design defect claim under the NJPLA requires that the product was defective, that the defect existed when the product left the defendant's control, and that the defect caused injury to a reasonably foreseeable user. Jurado v. Western Gear Works, 619 A.2d 1312, 1317 (N.J. 1993). "Whether a product is defective depends on whether it 'is not reasonably fit, suitable and safe for its intended or reasonably foreseeable purposes.'" McGarvey v. G.I. Joe Septic Serv., Inc., 679 A.2d 733, 740 (N.J. Super. Ct. App. Div. 1996) (quoting Jurado, 619 A.2d at 1317). To establish a design defect at the summary judgment stage, a plaintiff must provide sufficient evidence such that a reasonable jury could find "either that the product's risks outweighed its utility or that the product could have been designed in an alternative manner so as to minimize or eliminate the risk of harm." Lewis v. American Cyanamid Co., 715 A.2d 967, 980 (N.J. 1998). The plaintiff thus bears a burden to demonstrate "under a risk-utility analysis the existence of an alternative design that is both practical and feasible." Id.[2]

---

[2] New Jersey courts use a seven-factor balancing test to determine whether a product is fit for its intended uses, considering:

> (1) the usefulness and desirability of the product; (2) the likelihood and seriousness of injury; (3) the availability of a substitute product; (4) the manufacturer's ability to eliminate the danger without impairing the product's utility; (5) the user's ability to avoid danger by due care; (6) the user's anticipated awareness of the danger considering general public knowledge or the obvious condition or the existence of suitable warnings or instructions; and (7) the feasibility of the manufacturer's spreading the loss by setting the price or carrying liability insurance.

McGarvey, 679 A.2d at 740 (citing Johansen v. Makita USA, Inc., 607 A.2d 637 (1992)).

Analysis

OSHA imposes a non-delegable duty on employers regarding personal protective equipment.  29 C.F.R. 1910.132(d)(1).  Plaintiff has argued that because an ARAMARK sales representative[3] was aware of Leone Industries' business operations, ARAMARK had a duty to insist upon only fire resistant uniforms.

> Q:  Did you have the opportunity to look at their facility?
>
> A:  Yes.
>
> Q:  Did you go inside and take a look at the machines that they were operating and what they do?
>
> A:  Yes.
>
> Q:  Were you familiar that they made glass jars and bottles?
>
> A:  Yes.
>
> Q:  Did you have the opportunity to look at the machines that were in their facility, the types of machines they were running?
>
> A:  Just walking by peripherally.  I didn't know what they were.
>
> Q:  Bottle making machines though, right?
>
> A:  Right.
>
> Q:  Are you aware that the materials that they make require that the glass be heated up and the bottles be at a high temperature?
>
> A:  Yes.

Martin Cert., Ex. 2, Buccelli Dep., pp. 30-31.  Plaintiff contends that this is sufficient to establish a duty on ARAMARK not to release its product into the stream of commerce

---

[3] Two other ARAMARK salespersons testified that they knew Leone was a glass making facility, but did not observe the actual operations.  Basilo Cert., Ex. J, Taylor Dep., 16, 18; Martin Cert., Ex. 8, Basilo Suppl. Cert., Ex. I, Martin Dep., pp. 14-16, 22.

for such known misuse.  Pl. Br., p. 1 (citing McGarvey v. G.I. Joe Septic Serv., Inc., 679 A.2d 733 (N.J. Super. Ct. App. Div. 1996)).  In fact, Plaintiff has cross-moved for summary judgment on the issue of design defect, arguing that ARAMARK violated the NJPLA as a matter of law because it released a product to the end user for an actually known misuse, even though the product was not defective when it left the hands of the manufacturers.  Id.  Plaintiff also argues that summary judgment on the negligence claim should be denied because its conduct in renting uniform shirts that were not designed to be used in the "hot end" at Leone Industries was not reasonable under the circumstances.

ARAMARK offered Leone Industries various fire resistant apparel options, including an offer of free fire resistant clothing as an inducement to re-sign a continuing uniform rental agreement, but Leone rejected the offer and opted to continue its long-standing practice of renting untreated 100% cotton uniforms for its workers.  Frank J. Labletta, Director of Purchasing for Leone Industries, testified that from the outset of Leone's relationship with ARAMARK, fire resistant uniforms were offered as an option:

> Q:  During the discussions with Mr. Martin or anyone from Aramark prior to your execution of the document marked as A-2 on September 25, 2003, did anyone from Aramark discuss with you flame-resistant materials for shirts or pants for the employees?
>
> A:  Yes. . . .  [T]hey had brought actual samples. . . I recall that they asked me to take a look at this.  And we put them out to the supervision in the hot end department.
>
> Q:  And then what happened?
>
> A:  The supervision said that they didn't like the uniforms, they were too heavy and too hot in the hot end environment. . . .  [A]ctual samples were given to me.  I brought in the hot end guy and said these are samples left by Aramark, they want you to take a look at them, they're flame resistant. And he took them and a week later said they don't – the employees don't like them.

Basilo Cert., Ex. E, Labletta Dep., pp. 23-24.  Again in 2009,

> A:  There was flame resistant given in '09 to the hot end.  Same – same setup that – in '03. . . .  Discussions were these are flame resistant, these are 100 percent cotton.  It was agreed that they would take them and look at them for a week and we would get back to Aramark.
>
> Q:  Mr. Oriente . . . just unilaterally just decided he's going to try to offer you flame-retardant coveralls to see if you –if the company would like them as part of a sweetener to take the deal; is that right?
>
> A:  That sounds right.
>
> Q:  Would it be fair to say that you elected not to take the coveralls because they were, in your opinion, unnecessary?
>
> A:  I didn't think they'd be worn.
>
> Q:  But he was going to give them to you for free?
>
> A:  I realize that but I still don't think they'd be worn over the uniform.
>
> Q:  So you elected not to even bother with it?
>
> A:  Didn't even run that up to Paul.

Basilo Cert., Ex. E, Labletta Dep., pp. 105-106.

In fact, the President of Leone Industries in 2009, Peter Leone, instructed Labletta, "he had said to me when you – before you sign the contract look into flame retardant. . . . He was the one who said to me if you're going to have to sign an agreement for five more years with Aramark look into flame but make sure you get buy-in from the union and the workforce out there."  Martin Cert., Ex. 7, Labletta Dep., pp. 60-61.  Despite Peter Leone's request, the company rejected any offer of fire resistant clothing:

> Q:  The next bullet point, bulk inventories of FR coveralls no charge.  Just in case needed. . . .  Okay, so do I understand correctly that Mr. Oriente was going to provide you with flame-resistant overalls at no charge as part of the program?
>
> A:  In case we needed it, yes.

> Q: All right, did he do so?
>
> A: No.
>
> Q: Why not?
>
> A: There was no interest in coveralls.
>
> Q: He offered that to you?
>
> A: Correct.
>
> Q: Offered to provide you with no charge for flame-resistant coveralls because he knew at the time that the employees had elected 100 percent cotton non-flame resistant material, right?
>
> A: Right. . . . I didn't want them. . . . [T]here was a lot of resistance over the uniforms and having a coverall on top of a uniform I – I felt was not going to be accepted.
>
> Q: You thought the employees wouldn't wear the flame-resistant coveralls even if they were provided at no charge?
>
> A: Yes.
>
> Q: So as a result, Leone did not get free flame-resistant coveralls at or about the time the contract was entered into August 31, 2009, correct?
>
> A: Correct.

Martin Cert., Ex. 7, Basilo Suppl. Cert., Ex. E, Labletta Dep., pp. 66-69.

> ARAMARK's sales representative corroborated the offer:
>
> A: At the time in 2009 during the discussion of the renewals we offered the potential to rent them FR garments.

Basilo Cert., Ex. H, Buccelli Dep., p. 31.

> Q: There were some documents produced – specifically an email in I think it was August 16, 2009 – where Mr. Oriente wrote to Frank LaBletta and he mentioned throwing in FR coveralls at no charge; were you aware of that?
>
> A: Yes. . . . Well, when they – when we presented the contract and they rejected FR as – for whole uniforms at that point for any customer we

> tried to do anything we can to get them to renew and sign.  So if it's a free week of service, if it's, you know, we'll give you a pair of boots for ten employees, we do that.  So in lieu of them not wanting to spend the money we said why don't we just give you some FR coveralls for free, you can have them if you need them for protection, wear them, if you don't, that's, you know – it's up to you guys.  It's your choice whether you take them and use them or not.

Basilo Cert., Ex. H, Buccelli Dep., pp. 123-24.

Further, both Service Agreements, dated August 30, 2004 and August 31, 2009 signed by Leone's Director of Purchasing Frank Labletta and Ludovico Oriente for ARAMARK, contained the following provision:

> UNLESS SPECIFIED IN WRITING IN THIS AGREEMENT, THE UNIFORMS AND APPAREL SUPPLIED UNDER THIS AGREEMENT ARE NOT FLAME RESISTANT OR RESISTANT TO HAZARDOUS SUBSTANCES.  THEY CONTAIN NO SPECIAL FLAME RESISTANT OR HAZARDOUS SUBSTANCE RESISTANT FEATURES AND THEY ARE NOT DESIGNED FOR USE IN AREAS WHERE THEY MAY CATCH FIRE OR WHERE CONTACT WITH HAZARDOUS SUBSTANCES IS POSSIBLE.  CUSTOMER AGREES TO INDEMNIFY AND HOLD AUS HARMLESS FROM AND AGAINST ANY LOSS, CLAIM EXPENSE, INCLUDING ATTORNEY'S FEES, OR LIABILITY INCURRED BY AUS AS A RESULT OF THE USE OF SUCH UNIFORMS AND APPAREL IN AREAS WHERE CONTACT WITH FLAME OR HAZARDOUS SUBSTANCES IS POSSIBLE.  CUSTOMER WILL IMMEDIATELY NOTIFY AUS OF ANY TOXIC OR HAZARDOUS SUBSTANCE INTRODUCED BY CUSTOMER ONTO THE UNIFORMS OR APPAREL AND AGREES TO BE RESPONSIBLE FOR ANY LOSS, DAMAGE OR INJURY EXPEREINCED BY AUS OR ITS EMPLOYEES AS A RESULT OF THE EXISTENCE OF SUCH SUBSTANCES.  AUS RESERVES THE RIGHT NOT TO HANDLE OR PROCESS ANY UNIFORMS OR APPAREL SOILED WITH TOXIC OR HAZARDOUS SUBSTANCES.

Basilo Cert., Ex. L & M.  ARAMARK's Spring 2004 Buyer's Guide also provided:

> OSHA standard 29 CFR 1910.132 requires employers in general industry to conduct an assessment and provide employees personal protective equipment, including protective clothing, to protect them from hazards in the workplace.

Basilo Cert., Ex. N.

Frank J. Labletta, Director of Purchasing for Leone Industries, testified that he

10

understood this language:

> Q: Quote, unless specified in writing in this agreement, the uniforms and apparel supplied under this agreement are not flame resistant or resistant to hazardous substances.  They contain no special flame resistant or hazardous substance resistant features and they are not designed for use in areas where they may catch fire or where contact with hazardous substances is possible, end quote for those sentences. . . .  [Y]ou knew after reading this that these shirts that you were giving to your employees were not to be used in an area where they may catch fire?
>
> A: Yes.
>
> Q: And it goes on to talk about in the next sentence, quote, The Customer agrees to indemnify and hold harmless AUS  - excuse me, and hold AUS harmless from and against any loss, claim, expense including attorney's fees or liability incurred by AUS as a result of the use of such uniforms and apparel in areas where contact with flame or hazardous substances is possible.  You understood that at the time that you entered into this, correct?
>
> A: Yes.

Basilo Cert., Ex. E, Labletta Dep., pp. 32-34.

Moreover, a label on the uniform shirts themselves warned "NOT FLAME RESISTANT."  Basilo Suppl. Cert., Ex. Q.  Even though extensive warnings were given orally and in writing, Plaintiff argues that ARAMARK had a duty to refuse to release the 100% cotton uniform shirts to Leone Industries.

Plaintiff's reliance upon McGarvey v. G.I. Joe Septic Serv., Inc., 679 A.2d 733, 744 (N.J. Super. Ct. App. Div. 1996), is inapposite.  There, the cab and chassis of a truck manufactured by Ford Motor Company and sold by dealer Rice & Holman Ford left the dealer's lot late at night "incomplete," as it was without rear side lights or reflectors.  It had arrived from Ford via motor carrier, but was picked up from the dealer by one of the buyer's truck drivers.  That night, the plaintiff struck the chassis with his vehicle.  As to the dealer, the Appellate Division found the incomplete product was defective as a matter of law because the dealer released the chassis at night, knowing that it would be

driven without adequate lighting, that is, knowing the product would be misused.  "[The buyer's driver's] misuse of the chassis by driving it at night without adding the additional equipment required for safe operation on the roads was not just foreseeable, it was actually known to [the dealer]."  Id.  The dealer "had a duty to make certain that [the seller's driver] did not drive the chassis at night without adding temporary side lights.  It breached this duty by releasing the chassis to [the driver] for immediate use."  Id.  The dealer "delivered a defective product."  Id.

Accordingly, in this case, Plaintiff argues that where the seller of a product has actual knowledge of the misuse of the product, even if the product is not defective at the time it left the manufacturer, the product is deemed defective as a matter of law to the seller.  Pl. Br., p. 16.  "The seller has a duty to prevent the actual misuse of the product."  Id., p. 18.  "Defendant knew of the misuse and decided to rent the product for that misuse anyway.  Aramark made a business decision to enter into an agreement with Leone.  Along with that decision come the responsibility and liability established under the New Jersey Product Liability Act."  Id.

As an initial matter, the record does not support a finding that ARAMARK knew that its uniform shirts would be "misused" by Leone's employees.  In keeping with the testimony cited above, ARAMARK's representative Buccelli testified that although he walked through the plant once, he did not recall seeing certain machines at Leone's facility, and clarified, "It was – I was in my first month, it was pretty overwhelming.  I think that was the first factory I had ever been into."  Martin Cert., Ex. 2, Buccelli Dep., pp. 69-70.  ARAMARK representative James Martin also testified, "From a safety standpoint we weren't permitted to go where the actual bottles were being manufactured."  Martin Cert., Ex. 8, Basilo Suppl. Cert., Ex. I, Martin Dep., p. 16.

Further, the McGarvey court did not find that the dealer should not have sold the product to the customer, as Plaintiff has argued here. It was the incomplete status of the product and its condition at the time of delivery to an unaware customer that was the focus of the court's analysis. In this case, the 100% cotton shirt Plaintiff was wearing at the time of his accident was not an "incomplete" product. It functioned as a 100% cotton uniform shirt should have. Moreover, in contrast to the McGarvey situation, where the seller failed to advise the buyer of the lack of necessary lighting, here ARAMARK gave repeated warnings as to the limitations of the uniform at issue.

In addition, in a similar case, summary judgment was granted in favor of a uniform vendor and against a diesel mechanic whose uniform caught fire when he tried to start a diesel engine with a gas soaked rag and an open bucket of gasoline two to three feet away. See Spears v. Cintas Sales Corp., No. 07-1701, 2009 WL 2167634, *8-9 (W.D. La. Jul. 20, 2009) ("A manufacturer will not be responsible for 'every conceivable foreseeable misuse of a product.'"). In that case, the court disagreed with the same argument that Plaintiff advances here, finding that although a sales representative for the uniform vendor made a sales pitch in the mechanic shop – where welding machines, blow torches, gasoline, and diesel engines were in plain sight – such circumstance did not overcome the contract between the uniform vendor and the employer which warned that the uniforms supplied were not flame resistant. Id. at *12-13, 14 ("[A] salesman . . . should have no duty to personally consult with each individual to whom uniforms are furnished to determine what flammability hazards may be encountered by each  . . . employee, particularly in light of the above contract provisions."). The United States Court of Appeals for the Fifth Circuit affirmed the grant of summary judgment:

> Spears has not shown that Cintas should have known that its warning was being ignored by users of the uniform. The facts that Cintas laundered uniforms with stains on them and that there was welding equipment on the premises are not sufficient to establish that Cintas should have known that Apeck employees were using the uniforms in areas of flammability risk. Although a Cintas sales person was in Apeck's shop and may have observed welding equipment and blowtorches, that does not mean that Cintas should have known that those employees who actually ordered uniforms would be exposed to flammability risks. The uniform rental agreement stated that Apeck warranted that none of its employees required flame retardant uniforms. As the district court concluded, Cintas "has a right to rely upon a customer assurance that the uniforms furnished are not required to be flame retardant." Accordingly, we hold that Spears's use of the uniform was not a reasonably anticipated use.

Spears v. Cintas Sales Corp., 414 Fed. Appx. 667, 671 (5th Cir. 2011). See also Johnson v. Unifirst Corp., 935 N.Y.S.2d 763, 765 (N.Y. App. Div. 2011) (finding summary judgment should have been granted in favor of uniform supplier on design defect claim by welder because supplier defendant fulfilled its duty when it offered flame resistant uniforms to welder's employer, "which was in the best position to evaluate the needs of its employees," but the employer "made a deliberate decision not to make defendant's flame resistant uniforms available to its employees"); Coleman v. Cintas Sales Corp., 40 S.W.3d 544, 549 (Tex. App. 2001) (affirming summary judgment for uniform supplier on design defect claim, stating that plaintiff's employer, "having been offered the option of flame-retardant uniforms, was entitled to choose the material most comfortable and economically feasible for employees who would not be exposed to a risk of fire. . . . [Supplier] is not required to provide only flame-retardant uniforms when there is no foreseeable risk of exposure to fire associated with the product's clearly intended use.").

Finally, Plaintiff's claim for negligence is subsumed by his cause of action under the NJPLA.  See Herman v. Sunshine Chem. Specialties, Inc., 627 A.2d 1081 (1993) (in enacting the NJPLA, the New Jersey Legislature expressly intended to consolidate all products liability claims into one single statutory cause of action); Tirrell v. Navistar Int'l Inc., 591 A.2d 643, 647 (N.J. Super. Ct. App. Div. 1991) (the NJPLA subsumes all common law causes of action for physical injury caused by a product, including negligence claims).  See also Johnson v. Unifirst Corp., 935 N.Y.S.2d 763, 764 (N.Y. App. Div. 2011) (finding, regarding negligence cause of action, summary judgment should have been granted for uniform supplier because it owed no duty to welder plaintiff to provide or recommend flame resistant uniforms); Stephens v. Paris Cleaners, Inc., 885 A.2d 59, 68 (Pa. Super. Ct. 2005) (finding uniform supplier owed no duty to a plaintiff burned during a manufacturing process, despite claim that it held itself out as an expert in the field of work uniforms, where contract with employer did not obligate it to make any specific recommendations for uniforms, supplier did not recommend specific uniforms, employer did not rely on supplier to choose uniforms, supplier did not inspect work site, and did not know nor should it have known that some employees needed flame resistant uniforms; rather, the obligations charged by plaintiff fell under OSHA and its regulations, the terms of which apply only to employers); McConnell v. Arrow Uniform Rental, Inc., No. 97 C 6551, 1999 WL 92908 (N.D. Ill. Feb. 17, 1999) (granting summary judgment in favor of uniform manufacturer/rental company because plaintiff failed to establish a duty to provide a flame resistant uniform or inform plaintiff that the uniform he chose was not flame resistant).

Conclusion

Under the circumstances of this case:

(a) a long-standing relationship evidenced by Service Agreements of August 30, 2004 and August 31, 2009 which contain warnings about the use of the uniform shirts;

(b) conversations with supervision which clearly discuss the use of the uniform shirts and the offer to supply flame resistant uniforms at no charge;

(c) the employer's awareness of the composition of the uniform shirts and the obvious condition of the uniform shirts and the existence of suitable warnings;

(d) the employees' experience with the use of the uniform shirts over several years;

(e) the direct rejection of the flame resistant uniforms offered at no charge; and

(f) no reliance on representations made by the supplier which influenced the decision to contract for the uniform shirts selected,

in essence, the record shows that there was knowledge of the warned risk and a knowing and voluntary selection of the uniform shirts.

As a result, ARAMARK's motion for summary judgment [62] will be granted and Plaintiff's motion for partial summary judgment [66] will be denied. An appropriate Order shall enter.


Dated: March 4, 2015                             /s/ Joseph H. Rodriguez
                                                JOSEPH H. RODRIGUEZ
                                                U.S.D.J.